UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| LYNARE PIPITONE and NATHAN PIPITONE, | : | |
| --- | --- | --- |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 5:16-cv-03777 |
| | : | |
| CAMP, DRESSER AND MCKEE, | : | |
| *also known as* CDM Smith, Inc., | : | |
| | : | |
| Defendant. | : | |

_____

**O P I N I O N**

**Defendant CDM Smith's Motion for Summary Judgment, ECF No. 19 - Granted**

**Joseph F. Leeson, Jr.**                                                                                       **May 1, 2017**
**United States District Judge**

**I.     Introduction**

Plaintiffs Lynare and Nathan Pipitone are developers who planned to construct a residential unit in Pequea Township, Lancaster County, Pennsylvania. They sought to obtain sewer service for their development from the Suburban Lancaster Sewer Authority ("the Authority"), a municipal authority that provides sewage collection and conveyance services for customers in Pequea Township and nearby areas. The Pipitones, filing suit under 42 U.S.C. § 1983, allege that the Authority's consulting engineering firm, Defendant Camp, Dresser and McKee, Inc., also known as CDM Smith, interfered with their ability to obtain sewer service from the Authority by imposing on the Pipitones unnecessary and costly requirements that delayed their development plans for eight years, in violation of the Pipitones' constitutional rights.

CDM Smith moves for summary judgment on the Pipitones' claims. Because the Court finds that the Pipitones have failed to present evidence from which a reasonable jury could conclude that CDM Smith, a private corporation, acted under color of state law or that CDM Smith had a "policy or custom" that caused the alleged constitutional violations, the Court grants CDM Smith's motion.

## II. Factual Background

### A. The Suburban Lancaster Sewer Authority and CDM Smith

The Authority provides sewage collection and conveyance services for its customers in the municipalities of Pequea Township, West Lampeter Township, and portions of Lancaster Township, in Lancaster County. The Authority, which was incorporated as a municipal authority in June 1970, is comprised of a five-member board.[1] The Authority does not have its own stand-alone offices, nor does it have any employees or staff. Def.'s Facts ¶¶ 2-3, ECF No. 19. CDM Smith, which first entered into a consulting agreement with the Authority in 1989, is the Authority's only engineering consultant and conducts numerous day-to-day tasks for the Authority. Among other things, CDM Smith reviews sewer capacity requests, performs the Authority's billing, answers customer complaints, reviews the Authority's annual operating budget, drafts all of the Authority's regulations, and, in the case of the Pipitones, drafts developers' agreements. Def.'s Facts ¶¶ 4-8; Pls.' Facts ¶ 32, ECF No. 25. In addition, representatives from CDM Smith attend all meetings of the Authority, which are typically held at CDM Smith's offices. Def.'s Facts ¶¶ 4-5; Pls.' Facts ¶ 32. For each monthly Authority meeting,

---

[1] *See* Suburban Lancaster Sewer Authority, http://www.sublancsewer.com/ (last visited May 1, 2017).

CDM Smith prepares an engineer's report that is incorporated into the meeting minutes; Frank Mincarelli, the solicitor for the Authority, records the meeting minutes. Def.'s Facts ¶ 9.[2]

**B.     The Summerfield development proposal**

In February 2007, the Pipitones requested from the Authority sufficient sewer capacity for a proposed residential development called the Summerfield Development ("Summerfield"), consisting of 148 residential units, in Pequea Township. Def.'s Facts ¶¶ 1, 12. In March 2007, CDM Smith submitted to the Authority a review of the Authority's conveyance capacity for Summerfield, which included an evaluation of the suitability of using the existing Marticville Pump Station ("MPS") for the development's sewer services. Def.'s Facts ¶ 15. CDM Smith concluded that the MPS did not have sufficient available capacity to accommodate the increased flows from Summerfield, and it proposed a number of alternatives to using the MPS, including the construction of a new pumping station. Def.'s Facts ¶ 15.

At the March 22, 2007 Authority board meeting, CDM Smith stated, among other things, that although the MPS could be expanded to accommodate additional sewage flows from Summerfield, the MPS's current site was too small and could not be expanded or upgraded to comply with current Authority specifications. Def.'s Facts ¶ 16; Pls.' Facts ¶ 5. At the April 26,

---

[2]     CDM Smith's statement of facts frequently cites and refers to exhibits containing meeting minutes. Each of these exhibits contains two separate documents, one of which is titled "Suburban Lancaster Sewer Authority: Authority Meeting," and the other of which is titled "Minutes of Suburban Lancaster Sewer Authority." The latter document contains a signature line for the Authority's secretary. It appears that the first document in each minutes exhibit is a report prepared by CDM Smith, whereas the second document is the report prepared by the board's solicitor. *See* Pl.'s Resp. Def. Facts. ¶ 28, ECF No. 26 (distinguishing between "the official minutes of [the Authority] as taken by the Township Solicitor" and "the CDM reports").
    The Pipitones repeatedly object to CDM Smith's citations to the CDM Smith reports, contending that these reports do not accurately reflect what transpired at the meetings. *See* Pl.'s Resp. Def. Facts. ¶ 28 (stating that "the official minutes of [the Authority] as taken by the Township Solicitor read differently than the CDM reports"). Accordingly, the Court's presentation of the facts relies only on the board minutes recorded by the solicitor.

2007 Authority board meeting, CDM Smith recommended, among other things, that a new pumping station be located on the Summerfield property, with construction costs being allocated between the Pipitones and the Authority. Def.'s Facts ¶ 18; Pls.' Facts ¶ 6. CDM Smith proposed that it would be responsible for all engineering and inspections for the new pump station, the construction of which would cost the Pipitones significantly more than upgrading the existing station. Pls.' Facts ¶ 7.

On May 7, 2007, CDM Smith provided the Authority and the Pipitones with: (1) a preliminary plan for the new pumping station to accommodate the sewage flows from Summerfield; (2) an opinion of the probable project total cost of $1.26 million; and (3) a potential cost sharing arrangement between the Pipitones and the Authority. Def.'s Facts ¶ 19. That same day, the Pipitones' engineer, Lake Roeder Hillard and Associates ("Lake Roeder"), provided the Authority and CDM Smith with several alternative proposals for upgrading the MPS at its existing site, rather than constructing a new pumping station on the Summerfield property. Def.'s Facts ¶ 20.

After reviewing Lake Roeder's proposals to upgrade the MPS at its existing location, CDM Smith informed Nathan Pipitone that it disagreed with a number of the basic engineering assumptions used by Lake Roeder. CDM Smith further stated that any upgrade of the MPS must meet current Authority standards, which in CDM Smith's opinion could not be met by upgrading the MPS at its existing location. Def.'s Facts ¶ 21.

According to the minutes at the May 24, 2007 Authority board meeting, Mr. Pipitone, along with a representative from Lake Roeder, were present to discuss the possible upgrade of the MPS as an alternative to the construction of a new pumping station. Def.'s Mot. Ex. 18, ECF

4

No. 19-4. Board member George Rutter informed Mr. Pipitone that the board would review and discuss his proposals for an upgraded station and get back to him. *Id.*

According to the minutes at the July 26, 2007 Authority board meeting, Russell MacNair, a consulting engineer for CDM Smith, stated that Mr. Pipitone's proposal for upgrading the existing station was inadequate in light of standards set by the Authority and by the Pennsylvania Department of Environmental Protection ("DEP"). Def.'s Mot. Ex. 20, ECF No. 19-4. A motion was made by board member Donald G. Beck, seconded by board member Richard Nissley, to authorize CDM Smith to inform Mr. Pipitone that the Authority could not approve his proposal to merely upgrade the pump at the MPS, and to explain the Authority's requirements for newly built and upgraded pumping stations. The motion carried unanimously. *Id.*

According to the minutes at the August 23, 2007 Authority board meeting, Mr. Pipitone discussed several alternatives for upgrading the MPS. Def.'s Mot. Ex. 23, ECF No. 19-4. The board "indicated that it may consider evaluating one of the proposed alternatives." *Id.*

According to the minutes at the September 27, 2007 Authority board meeting, the Authority informed Mr. Pipitone that his proposal to upgrade the MPS needed to be investigated further and that DEP approval of the concept was needed. Def.'s Mot. Ex. 24, ECF No. 19-4. The meeting minutes further show that "CDM [would] look at the design criteria that it feels are necessary for a pump station enhancement and then discuss the entire matter with DEP to see what design criteria it will require." *Id.*

On November 29, 2007, Mr. Pipitone, his engineer, CDM Smith, and DEP convened a meeting to discuss Mr. Pipitone's proposed upgrade of the MPS at its existing site. Def.'s Facts ¶ 30.

At the December 20, 2007 Authority board meeting, the Authority directed CDM Smith to provide cost estimates to Mr. Pipitone for his proposed upgrade to the MPS at its existing site. Def.'s Facts ¶ 32. On January 8, 2008, CDM Smith sent a proposal to Mr. Pipitone outlining the cost to upgrade the MPS at its current site pursuant to his engineer's design. The projected total cost was $411,353, to be shared proportionately between Mr. Pipitone and the Authority. Def.'s Facts ¶ 33.

According to the minutes at the February 28, 2008 Authority board meeting, Mr. Pipitone discussed upgrading the MPS. Def.'s Mot. Ex. 31, ECF No. 19-5. Mr. Pipitone stated that he was being required to upgrade the station beyond his needs and that he wanted to construct the improvements himself, rather than have the Authority perform the work. *Id.* The board discussed Mr. Pipitone's statements and authorized its solicitor to express its position on these matters and to negotiate with Mr. Pipitone. *Id.*

According to the minutes at the July 24, 2008 Authority board meeting, Frank Mincarelli, the solicitor for the Authority, described a meeting that he attended with Mr. Pipitone and several other persons concerning the upgrade of the MPS. Def.'s Mot. Ex. 32, ECF No. 19-5. The board then discussed the various options available to Mr. Pipitone and the Authority. *Id.* Upon a motion made by board member Donald G. Beck and seconded by board member Richard B. Nissley, the board determined that the easement area of the MPS was too small to permit upgrading or enlarging the MPS at that site. The board proposed an alternative arrangement that would connect Summerfield's wastewater collection system with the Authority's sewer system at a manhole located on Bauer Avenue; this arrangement would require the construction of a new pump station on the Summerfield property. *See id.* The motion carried unanimously. *Id.*

According to the minutes at the August 28, 2008 Authority board meeting, Mr. Pipitone was present "to discuss the Authority's decision" concerning the construction of a new pump. Def.'s Mot. Ex. 35, ECF No. 19-5. The meeting minutes show that "[t]he Authority determined that the [MPS] site was too small to accommodate an upgrade, particularly in light of the Authority's current specifications for pumping stations. In addition, the Board indicated that the existing station was sized correctly for the wastewater flows it is currently handling." *Id.*

On October 22, 2008, Mr. Pipitone met with the Authority's solicitor to discuss upgrading the MPS at its current location. Def.'s Facts ¶ 38.

According to the minutes at the August 27, 2009 Authority board meeting, the board discussed with Mr. Pipitone the possibility of upgrading the existing MPS, if Mr. Pipitone agreed to reimburse the Authority for the cost of the upgrade and submit another request for sewer capacity. Def.'s Ex. 38, ECF No. 19-5.

In March 2010, the Authority and Mr. Pipitone agreed to share the costs for upgrading the MPS at its existing location. Def.'s Facts ¶ 44; Pls.' Resp. Def.'s Facts ¶ 44, ECF No. 26. Thus, although CDM Smith had stated for many years that the existing pump station could not be upgraded, the Authority ultimately permitted the Pipitones to upgrade the station, over CDM Smith's objections. Pls.' Facts ¶¶ 8-9. The upgrade was conducted pursuant to Lake Roeder's initial design, which had been proposed in 2007. Pls.' Facts ¶ 9.

By letter dated September 23, 2010, CDM Smith informed Mr. Pipitone's engineer, Lake Roeder, that CDM Smith had performed a review of the sanitary sewer plans proposed by Lake Roeder and determined that, in their opinion, certain aspects of the plans did not comply with Authority specifications. Def.'s Mot. Ex. 48, ECF No. 19-6. The letter further stated that "[t]he Authority may also require that a sewer metering flume be installed in an appropriate manhole."

7

*Id.* (According to CDM Smith, a sewer metering flume allows the Authority to monitor and measure sewage flow through a manhole servicing private sewer lines. Def.'s Facts ¶ 50.)

At the June 7, 2011 Authority board meeting, Mr. Pipitone claimed that a monitoring manhole was an unnecessary expense item. Def.'s Facts ¶ 54. Russell MacNair of CDM Smith explained why he believed the monitoring manhole was necessary. According to the minutes, "[t]he Board considered the manhole issue and discussed the reasons for requiring it. Following the discussion, a motion was made by George E. Rutter, seconded by Donald G. Beck, approving the plan review letter issued by CDM, including the requirement for a monitoring manhole to be installed by the developer. The motion carried unanimously." Def.'s Mot. Ex. 54, ECF No. 19-6.

CDM Smith designed and mandated the use of a specific manhole, which ended up being an incorrect design, Pls.' Facts ¶ 24; as a result, the Pipitones were required to install a different gasket and cover the manhole's flume and risers with epoxy, Def.'s Facts ¶¶ 62-63. CDM Smith also provided incorrect plans for the existing pumping station. Pls.' Facts ¶ 26.

In August 2014, Mr. Pipitone engaged Bursich Associates, Inc., to design the upgrade for the MPS. Def.'s Facts ¶ 64. The design Bursich used was based on the original design proposed by Lake Roeder in 2007; this design was approved by DEP. Pls.' Facts ¶¶ 30-31.

In January 2016, the Authority and Mr. Pipitone executed a Settlement Agreement and Release wherein the Authority agreed to pay Mr. Pipitone's project costs for Summerfield in the amount of $318,000 and an additional $70,000 attributable to alleged delay costs and other costs incurred by Mr. Pipitone. Def.'s Facts ¶ 70. In February 2016, the Authority and Mr. Pipitone executed a Developers Agreement for upgrading the MPS. The Authority was responsible for $318,000 towards the costs of constructing the upgrade. Mr. Pipitone engaged DH Funk & Sons, LLC to construct the upgrade. Def.'s Facts ¶ 71.

By August 2016, DH Funk & Sons, LLC completed construction of the upgrade. Def.'s Facts ¶ 72. The last remaining aspect of the Summerfield project is for the upgraded MPS to be dedicated to the Authority, at which time all remaining sewer connection permits can be authorized and issued. Def.'s Facts ¶ 73.

### III. Standard of Review

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." *Id.*

### IV. CDM Smith did not act under color of state law, nor did a CDM Smith policy or custom cause the alleged constitutional violations.

#### A. CDM Smith did not act under color of state law.

CDM Smith contends, first, that the Pipitones' § 1983 claims must fail as a matter of law because CDM Smith did not act under color of state law. Specifically, according to CDM Smith, the record shows "only that [it] provided engineering consulting services to its client, the

9

Authority," concerning the Summerfield development, while "[a]t all times, the Authority remained the decision-maker for all aspects of Summerfield." Def.'s Mem. Supp. Mot. 5, ECF No. 19.

The Pipitones respond that CDM Smith is a state actor because it "controls each and every aspect of the Authority from hosting its meetings, from forming its budget to keeping the minutes to full administration." Pls.' Br. Opp'n 21, ECF No. 23. According to the Pipitones, the Authority's meeting minutes show that motions are rarely made during the meetings and that the Authority "defer[s] to CDM in nearly every aspect of their operations." *Id.* The Pipitones further contend that "[i]n this case, CDM acted unilaterally to contact outside agencies, take meetings, review agreements and perform other actions which were not at the direction of [the Authority]." *Id.* Further, the Pipitones contend that CDM Smith "went above and beyond the role of engineer in this project" and "far exceeded their role as municipal engineer" when it "met with third parties, demanded requirements for the Pipitone project outside of [the Authority's] regulations, engaged in legal review of documents . . . and demanded installation of excessive hardware that was not required of others." *Id.* at 12. According to the Pipitones, "[s]uch extreme lengths demonstrate that CDM went above and beyond standard engineering and usurped the role of solicitor and Board members when it came to the Pipitones' project." *Id.*

Section 1983 provides as follows:

> Every person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State* or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added). In short, "a suit under § 1983 requires the wrongdoers to have violated federal rights of the plaintiff, and that they did so while acting under color of state

law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) "The color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law." *Id.*

"The touchstone for [the] analysis of all state action claims" is the United States Supreme Court's decision in *Brentwood v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). *P.R.B.A. Corp. v. HMS Host Toll Roads, Inc.*, 808 F.3d 221, 224 (3d Cir. 2015). In *Brentwood*, "the Supreme Court held that 'state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'" *Id.* (quoting *Brentwood*, 531 U.S. at 295). To conduct this analysis, the Court of Appeals for the Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists," which are as follows:

> (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)).

Because the Pipitones do not indicate which, if any, of these tests applies to their case, the Court will address each in turn.

### i. CDM Smith did not exercise powers that are traditionally the exclusive prerogative of the state.

"The Supreme Court has made clear that the scope of exclusive government functions is limited, reaching only those activities that have been 'traditionally the *exclusive* prerogative of the State.'" *Groman*, 47 F.3d at 640 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)).

11

"[T]his test imposes a 'rigorous standard' that is 'rarely . . . satisfied,' . . . for 'while many functions have been traditionally performed by governments, very few have been "exclusively reserved to the State."'" *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 165 (3d Cir. 2001) (quoting *Mark*, 51 F.3d at 1142; *Flagg Brothers Inc. v. Lefkowitz*, 436 U.S. 149, 158 (1978)). "In the course of enunciating the contours of what constitutes an exclusive government function, the Supreme Court has held that receipt of public funds and the performance of a function serving the public alone are not enough to make a private entity a state actor." *Groman*, 47 F.3d at 640.

The Pipitones have not identified any challenged action by CDM in this case that constituted a function exclusively reserved to the State, nor does a review of the record reveal any such action. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974) ("The Pennsylvania courts have rejected the contention that the furnishing of utility services is either a state function or a municipal duty."); *O'Brien v. Twp. of New Buffalo*, No. 1:01-CV-365 RAE, 2003 WL 25426577, at *6 (W.D. Mich. July 21, 2003) ("Water, sewer, and building regulation is not clearly a power traditionally reserved to the state such that exercise of that power by a private actor under contract transforms the private actor into a state actor.").

Moreover, the Pipitones' contention that CDM Smith "controlled" the Authority is belied by the record. The record shows that the Authority regularly held board meetings at which the board discussed, passed motions, and made decisions concerning the issues central to this case. The fact that CDM Smith conducted consulting services for the Authority does not make it a state actor. *See Win & Son*, *Inc. v. City of Philadelphia*, 162 F. Supp. 3d 449, 459 (E.D. Pa. 2016) (finding that the fact that a private contractor, a demolition company, "performed the [demolition] work under the government's control, did so at the City's request, and received government funds does not make it a state actor" when "[t]he record show[ed] that [the

contractor] was not permitted to perform any discretionary *government* functions" and "[i]ts actions were limited to fulfilling the terms of its contract with the government").

### ii. CDM Smith did not act with the help of or in concert with state officials.

Under the second test enumerated in *Kach*, "[t]he government 'normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 634–35 (1991) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). For example, in *Shelley v. Kraemer*, 334 U.S. 1, 68, (1948), state action was found where "state courts were called upon to enforce racially restrictive covenants against sellers of real property who did not wish to discriminate." *Id.* Here, however, the Pipitones do not allege, nor is there evidence in the record to show, that the Authority exercised coercive power over CDM Smith or provided "significant encouragement" to CDM Smith. On the contrary, the gravamen of the Pipitones' allegations is that CDM Smith exercised power over the Authority and otherwise "acted unilaterally" to harm the Pipitones.

### iii. CDM Smith was not in a symbiotic relationship with the Authority.

The third test enumerated in *Kach* involves situations in which "[t]he State has so far insinuated itself into a position of interdependence with . . . [the acting party] that it must be recognized as a joint participant in the challenged activity." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995) (quoting *Krynicky v. University of Pittsburgh*, 742 F.2d 94, 98 (3d Cir. 1984)). The key to applying this test is to "look first at the relationship" between the state and the private party to determine whether the relationship is characterized by "joint beneficial activities"; if so, the court must then go on to "test whether the conduct [complained

of] could be linked to the joint beneficial activities." *See Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 241 (3d Cir. 2002).

A "classic application" of this test occurred in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961), in which the Supreme Court "deemed a private restaurant's discriminatory act state action because the restaurant was located in a building owned by the Wilmington Parking Authority, an agency of the state." *Mark*, 51 F.3d at 1142-43 (summarizing *Burton*). In view of subsequent Supreme Court jurisprudence, the Court of Appeals for the Third Circuit has held that "while *Burton* remains good law, it was crafted for the unique set of facts presented, and [the Third Circuit] will not expand its reach beyond facts that replicate what was before the Court in *Burton*." *Crissman*, 289 F.3d at 242.

This case does not present such facts. In particular, the Pipitones do not claim that the conduct complained of here "was necessary for the continued financial viability" of either the Authority or CDM Smith, "one finding (among many others) necessary to replicate the factual scenario present in *Burton*." *See P.R.B.A. Corp.*, 808 F.3d at 224 n.2.

In sum, the record does not contain evidence from which a reasonable jury could find that CDM Smith's conduct in this matter "may be fairly treated as that of the State itself."[3]

---

[3]  An additional test, called the "entwinement test," asks whether "[t]he nominally private character of the [private entity] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and [thus] there is no substantial reason to claim unfairness in applying constitutional standards to it." *P.R.B.A. Corp.*, 808 F.3d at 224 (quoting *Brentwood*, 531 U.S. at 298). Among other things, this test focuses on "evidence of explicit involvement of the governmental authority in the *specific action* the plaintiffs challenge." *Id.* at 225. Under this test as well, the Pipitones have failed to present evidence that CDM Smith acted under color of state law. As discussed above, the gravamen of their allegations is that CDM Smith acted "unilaterally," without the involvement of the Authority.

**B.** **There is no evidence in the record that the alleged constitutional deprivations resulted from a policy or custom of CDM Smith's.**

CDM Smith next contends that even assuming, for the sake of argument, that it acted under color of state law, the Pipitones have failed to present any evidence that the alleged constitutional violations were the result of a CDM Smith custom or policy. The Pipitones, without explanation, have offered no response to CDM Smith's argument on this threshold issue.

Under the Supreme Court's decision in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), in order to bring "a § 1983 claim against a local government or government entity (including a private corporation . . . that is alleged to be acting under color of state law . . . ) for the actions of an employee of one of those entities, a plaintiff cannot rely upon respondeat superior liability, but he must show that the entity had a policy or custom that caused his deprivation of a constitutional right." *Defreitas v. Montgomery Cty. Corr. Facility*, 525 F. App'x 170, 176 (3d Cir. 2013).

> "A policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict. A custom is an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law." . . . A policy or custom can be established in three ways: (1) the entity or supervisor promulgates an applicable policy statement and the act the plaintiff complains of is the implementation of that policy; (2) the policymaker, without a formally announced policy, violates federal law itself; or (3) the "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."

*Id.* (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003))

Accordingly, "[t]o survive summary judgment, [the Pipitones] must not only identify a policy or custom adopted by [CDM Smith] that caused [their] alleged injuries but also identify the [CDM Smith] individual with policymaking authority." *See Marquez v. City of Philadelphia*,

15

No. CV 14-1284, 2015 WL 5139408, at *11 (E.D. Pa. Sept. 1, 2015). The Pipitones have failed to do this; indeed, they have not even attempted to do so. First, the Pipitones have not identified any policy or custom adopted by CDM Smith that caused their injuries, nor does the record reveal any such policy or custom. Second, although the record contains references to various CDM Smith employees, there is no evidence that any of these persons was a policymaker for CDM Smith. The Pipitones' failure to identify any policy or custom and their failure to identify any individual at CDM Smith with policymaking authority results in dismissal of their claims. *See id.*

## V. Conclusion

For the reasons set forth above, CDM Smith's Motion for Summary Judgment is granted. A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge